IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 1, 2019

**IN RE JAXX M.**

**Appeal from the Chancery Court for Roane County**
**No. 2017-AD-513    Frank V. Williams, III, Chancellor**

_____

**No. E2018-01041-COA-R3-PT**

_____

This appeal involves the termination of a mother's parental rights to her son. The trial court found that all grounds alleged in the petition had been proven and that termination was in the best interest of the child. We reverse the trial court's ruling as to two grounds for termination but otherwise affirm the order terminating Mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part; Reversed in Part; and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and ANDY D. BENNETT, JJ., joined.

Christopher Shawn Roberts, Rockwood, Tennessee, for the appellant, Brianna B.

Lauren R. Biloski, Clinton, Tennessee, for the appellees, Donald M., and Jessica M.

**OPINION**

## I.    FACTS & PROCEDURAL HISTORY

The child at issue in this proceeding, Jaxx M., was born out-of-wedlock to Donald M. ("Father") and Brianna B. ("Mother") in March 2013. The record before us is sparse and does not shed any light on the parties' circumstances for the first two years of the child's life. However, in October 2015, when Jaxx was two years old, Mother contacted Father and indicated that she was in a bad situation and unable to care for Jaxx. Mother was working as "a dancer" and battling depression. On October 20, 2015, Mother and Father executed a one-paragraph "Custody Agreement," which stated, in pertinent part:

As of this day, [Mother] is willingly giving all parental rights of Jaxx [] to [Father]. This is for [Mother] to have time to sort out personal issues and to rehabilitate herself. . . . It is agreed that parental rights are [Father's] until further notice. It is also agreed that [Mother] can still talk to Jaxx [] and have visitation with him when convenient for both parties.

On or about the same day the written agreement was signed, Father filed a petition for temporary emergency custody with the juvenile court of Roane County. On October 27, 2015, the juvenile court held a preliminary hearing and placed temporary custody of Jaxx with Father. Mother was ordered to pay child support of $100 per month despite Father's request to waive child support. The order provided that Mother could have supervised visitation with Jaxx upon agreement of the parties if supervised by Father or his designee.

For a short time, approximately two to three months, Father and/or his girlfriend supervised visits between Mother and Jaxx at a local park. These visits would typically last one to two hours and occurred either every Saturday or every other Saturday. According to Mother, she requested more time with Jaxx, but Father refused. According to Father, Mother would start crying at the end of each visit in an "over the top" manner, causing Jaxx to cry as well. Mother also engaged in some "slight confrontation[s]" with Father's girlfriend during the visits. Then, at the last of these visits, Mother approached Father's girlfriend and started talking about her past relationship with Father, saying "very vulgar and inappropriate things about sexual activity" and asking about sexual activities between Father and his girlfriend. When Father said she had "gone too far" and indicated that he was ending the visit, Mother took Jaxx to the top of a jungle gym and "barricaded" him there. According to Father, Mother was arguing and cursing loudly. Father called the police and showed them the custody order. After the police discussed the situation with Mother, she returned Jaxx to Father. However, Father and his girlfriend stopped supervising visits for Mother after this incident. Father's girlfriend also blocked Mother from contacting her personal cell phone because Mother continued to send pictures of herself to Father's girlfriend despite repeated requests to stop.

The juvenile court held an adjudicatory and dispositional hearing in April 2016. Mother did not appear at the hearing, allegedly because she was confused about the date, but she was represented at the hearing by appointed counsel. The juvenile court found that Jaxx was dependent and neglected in the care of Mother and granted custody to Father. The order provided that Mother could have visitation at a time and location agreed by the parties if supervised by "Parent Place," another entity, or a supervisor agreed upon by the parties. The order provided that any visits would be terminated if Mother appeared to be under the influence or made inappropriate statements. The order stated that if either party desired modification of the order, they would be required to file a petition with the clerk.

After entry of the order, Father went to Parent Place and completed the intake

- 2 -

process that would enable Mother to have supervised visitation. However, Parent Place contacted Father a couple of weeks later and informed him that they were terminating the process due to their inability to contact Mother. According to Mother, Parent Place was going to require her to pay money for each visit, and Mother knew that she did not have the income or transportation to be able to participate. (Mother began working at a fast food restaurant in March 2016, but she was fired in April.) Around this same time, Mother showed up unannounced to a visit that Father permitted for Jaxx and Mother's mother on Easter. Mother was upset and crying, and Father ended the visit. According to Mother, she also saw Jaxx at a restaurant in April.

No more visits occurred after April 2016. Three-year-old Jaxx continued to reside with Father, and by all accounts, he did well in his care. Father married his girlfriend (now "Stepmother") in July 2016. Mother sent a message to Father and asked him not to marry Stepmother, but she did not ask to visit Jaxx.

Mother's circumstances did not improve during this time period. She was cited for driving with a suspended driver's license and did not appear for her court dates. The State of Tennessee filed a petition for civil contempt against Mother on Father's behalf in an attempt to collect her child support arrearage, and in August 2016, the juvenile court entered an order finding Mother in civil contempt for willfully failing or refusing to pay child support. She had paid only $103 since December 2015 and owed an arrearage of $696. According to the order, Mother admitted she had "no excuse for her poor pay history," as she was fired from the fast food restaurant and "paid more in forfeited cash bond than payments of her own." Around September 2016, Mother was evicted from public housing for failure to pay rent, and a judgment was entered against her for $708. She started working at a different fast food restaurant. However, she was also convicted of shoplifting for "[s]witching tags on clothes" and placed on probation. Mother violated her probation by failing to meet with her probation officer and failing a drug test. She was then required to complete a drug and alcohol class but failed to do so. Mother contacted Father in October 2016 to ask if *her mother* could visit with Jaxx before she underwent surgery, but Mother did not ask to visit herself. This was Mother's last attempt to contact Father.

Mother had a couple of chance encounters with Jaxx during this timeframe. In November 2016, Mother went with her boyfriend to Jaxx's school in order to see her boyfriend's child and encountered Jaxx. According to Mother, she only pointed out Jaxx and began crying and left. However, the next day, the school banned Mother from the premises due to the incident. In December 2016, she had another random encounter with Jaxx and a relative at a Wal-mart store, where Mother approached them to talk, the relative asked her to leave but Mother admittedly "tried talking to them some more," and the police were called.

At some point, Mother filed a petition in juvenile court seeking to modify her

visitation with Jaxx, but she failed to appear at the hearing, so it was dismissed. According to Mother, she was not able to show up for the hearing because she was in an abusive and controlling relationship with her boyfriend. By December 2016, Mother had quit her job at the second fast food restaurant, also allegedly because of the controlling and abusive relationship. In early 2017, Mother became pregnant with another child.

On March 3, 2017, Father and Stepmother (together, "Petitioners") filed a petition in chancery court for termination of Mother's parental rights and adoption by Stepmother.[1] As grounds for termination, the petition alleged abandonment by willful failure to visit and support during the preceding four months; abandonment by wanton disregard for the welfare of the child; and failure to manifest an ability and willingness to assume custody or financial responsibility. The trial court appointed an attorney for Mother and a guardian ad litem for the child. During pendency of the termination action, Mother was charged with theft for consuming a banana and taking a package of hot dogs from a store without paying for them.

The termination trial was held on March 5, 2018, just weeks before Jaxx's fifth birthday. The trial court heard testimony from Father, Stepmother, and Mother. On May 10, 2018, the trial court entered a written order terminating Mother's parental rights, finding that each of the grounds for termination had been sufficiently proven and that termination was in the best interest of the child.[2] It also granted the adoption petition filed by Stepmother. Mother timely filed a notice of appeal.

## II. ISSUES PRESENTED

Mother presents the following issues for review on appeal:

1. Whether the trial court made sufficient findings of facts and conclusions of law to support its ruling by clear and convincing evidence;

2. Whether the trial court erred by entering an order on the termination that was not timely filed pursuant to Tennessee Code Annotated § 36-1-113(k); and

3. Whether the trial court erred by finding clear and convincing

---

[1] A prospective adoptive parent has standing to petition to terminate parental rights. Tenn. Code Ann. § 36-1-113(b)(1). And, "a child's parent may join in a petition to terminate parental rights for the purpose of consenting to an adoption by a stepparent." *In re Paetyn M.*, No. W2017-02444-COA-R3-PT, 2019 WL 630124, at *4 (Tenn. Ct. App. Feb. 14, 2019); *see* Tenn. Code Ann. § 36-1-117(f) ("[W]here the stepparent of a stepchild seeks to adopt a stepchild, the co-signing of the petition by the child's parent who is the spouse of the petitioner shall not affect the existing parent/child legal relationship between that parent and the parent's child who is the subject of the adoption petition by the stepparent of the child.").

[2] An amended order was entered on April 4, 2019, to clarify whether an exhibit was attached to the order.

- 4 -

evidence that it was in the child's best interest to terminate Mother's parental rights.

Although Mother does not raise any issue on appeal regarding the statutory grounds for termination, we must also review the trial court's findings as to those grounds. *See **In re Carrington H.***, 483 S.W.3d 507, 511 (Tenn. 2016) (holding that "appellate courts must review a trial court's findings regarding all grounds for termination and whether termination is in a child's best interests, even if a parent fails to challenge these findings on appeal").

## III.   STANDARDS APPLICABLE TO TERMINATION PROCEEDINGS

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." ***In re Kaliyah S.***, 455 S.W.3d 533, 546 (Tenn. 2015). Pursuant to the statute, a party seeking termination of parental rights must prove two elements. ***Id.*** at 552. First, the petitioner must prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated section 36-1-113(g). ***Id.*** Second, the petitioner must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(i). ***Id.***

Because of the constitutional dimension of the parental rights at stake, the petitioner must prove both of these elements by clear and convincing evidence. ***In re Bernard T.***, 319 S.W.3d 586, 596 (Tenn. 2010). Clear and convincing evidence produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established, eliminating any serious or substantial doubt about the correctness of the findings. ***Id.***

Due to the heightened burden of proof in parental termination cases, we adapt our customary standard of review on appeal. ***In re Audrey S.***, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). First, we review the trial court's factual findings de novo in accordance with Tennessee Rule of Appellate Procedure 13(d), presuming each finding to be correct unless the evidence preponderates against it. ***In re Carrington H.***, 483 S.W.3d at 524. Then, we make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." ***Id.*** (citing ***In re Bernard T.***, 319 S.W.3d at 596–97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." ***Id.*** (citing ***In re M.L.P.***, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV.   DISCUSSION

## A.    Sufficient Findings

The first issue raised by Mother on appeal is whether the trial court made sufficient findings of fact and conclusions of law to support its decision.  Tennessee Rule of Civil Procedure 52.01 provides that "[i]n all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment."  According to our supreme court, "[t]here is no bright-line test" for assessing the sufficiency of the trial court's factual findings, but they "'must include as much of the subsidiary facts as is necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue.'"  **Lovlace v. Copley**, 418 S.W.3d 1, 35 (Tenn. 2013) (quoting 9C *Federal Practice and Procedure* § 2579, at 328).  "A mere recital of the statutory grounds for termination is insufficient in cases of this nature."  **In re Ruger N.**, No. E2017-01379-COA-R3-PT, 2018 WL 5583970, at *4 (Tenn. Ct. App. Nov. 9, 2018) *perm. app. denied* (Tenn. Feb. 8, 2019).

Here, the trial court entered a seven-page written order setting forth its reasoning.  The order is somewhat difficult to follow, as the trial court did not discuss each ground for termination separately and then list factual findings applicable to each one.  Instead, the trial court first found that each statutory ground for termination was proven, and then it made several pages of factual findings that could arguably apply to one or more of those grounds.  Although the order is not a model of clarity, we conclude that when read as a whole, it provides sufficient findings of fact and conclusions of law to support the decision and does not necessitate a remand from this Court for additional findings.  Of course, we will review the adequacy of the trial court's factual findings to support each separate ground for termination in the sections that follow.

## B.    Timeliness of the Order

Next, Mother argues that the trial court failed to enter its written order in a timely manner.  Tennessee Code Annotated section 36-1-113(k) provides that a trial court hearing a termination case "shall enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing."  Because the trial court entered its written order over 60 days after the hearing, Mother asks this Court to reverse the trial court's ruling as untimely and remand "for further proceedings as may be necessary."

A trial court's mere failure to comply with the thirty-day requirement of section 36-1-113(k) does not require reversal or vacating the trial court's judgment.  *See **In re Mason C.***, No. E2018-01378-COA-R3-PT, 2018 WL 6600249, at *3 (Tenn. Ct. App. Dec. 14, 2018); ***In re Rainee M.***, No. E2015-00491-COA-R3-PT, 2015 WL 9584865, at *5 (Tenn. Ct. App. Dec. 30, 2015) ("Although the trial court failed to comply with the statute by entering a written order within thirty days of the hearing, we do not find that

Father is entitled to relief due to such delay."). "'We repeatedly have held that the time frame contained in the statute reflects the legislature's intent that parental termination cases be handled in an expeditious manner,'" but the thirty-day time frame "'is not mandatory.'" **In re Jackson G.**, No. M2013-02577-COA-R3-PT, 2014 WL 3844793, at *4 (Tenn. Ct. App. Aug. 4, 2014) (quoting **In re Isobel V.O.**, No. M2012-00150-COA-R3-PT, 2012 WL 5471423, at *4 (Tenn. Ct. App. Nov. 8, 2012)). When a trial court has made sufficient findings of fact and conclusions of law but simply failed to comply with the thirty-day requirement, a "remand would be pointless." **In re Autumn L.**, No. E2014-01240-COA-R3-PT, 2015 WL 3378869, at *6 (Tenn. Ct. App. May 26, 2015); *see also* **In re M.R.W.**, No. M2005-02329-COA-R3-PT, 2006 WL 1184010, at *4 (Tenn. Ct. App. May 3, 2006) (holding that "remand on appeal as requested by Mother would serve no purpose"). Accordingly, Mother is not entitled to relief with regard to this issue.

## C. Grounds for Termination

### 1. Abandonment

Pursuant to the termination statute, a ground for terminating parental rights exists if "[a]bandonment by the parent . . . as defined in § 36-1-102, has occurred." Tenn. Code Ann. § 36-1-113(g)(1). Tennessee Code Annotated section 36-1-102 provides five alternative definitions of abandonment. At the time of the proceedings in the trial court, section 36-1-102 provided that abandonment occurs when:

> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child; [or]
> . . . .
> (iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A). Because of "the difficulties inherent in proving that

a parent has willfully failed to visit or support a child for four consecutive months when the parent was incarcerated during all or part of that time," the General Assembly provided "two additional tests for abandonment for incarcerated or recently incarcerated parents." **In re Audrey S.**, 182 S.W.3d at 865. However, the additional tests listed in subsection (iv) "apply only if a parent is incarcerated at or near the time of the filing of the termination petition." *Id.* Specifically, subsection (iv) of the statute applies if the parent "is incarcerated at the time of the institution of an action" or "has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action." Tenn. Code Ann. § 36-1-102(1)(A)(iv).

Here, the Petitioners alleged and the trial court relied on *both* of these definitions of abandonment for purposes of terminating parental rights. The trial court's order states that Mother "abandoned the minor child and has willfully failed to visit and support the minor child for the four (4) consecutive months preceding the filing of the Petition for Termination of Parental Rights." Then, it also finds that Mother "exhibited a wanton disregard for the welfare of the minor child by continuing to engage in criminal activity since she lost custody of the minor child." From our review of the record, no evidence was introduced at trial to indicate that Mother was incarcerated at the time of filing of the petition or during all or part of the preceding four-month period. The trial court's order made no such finding either. At trial, Mother was simply asked how many times she had been incarcerated for nonpayment of child support since she lost custody of Jaxx in October 2015, and Mother said two to three times.

Because the evidence presented at trial did not reflect that Mother was incarcerated at the time of the institution of the action or during the four preceding months, we reverse the trial court's ruling that a ground for termination was established pursuant to subsection (iv). *See* **In re Navada N.**, 498 S.W.3d 579, 598-99 (Tenn. Ct. App. 2016) (reversing the ground of wanton disregard where there was no clear and convincing evidence that the mother was incarcerated at the time the termination petition was filed or shortly before, as incarceration was "a Condition Precedent").

We now turn to the trial court's ruling regarding abandonment as defined in subsection (i) for willful failure to visit and support. "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." **In re Audrey S.**, 182 S.W.3d at 864.[3]

---

[3] Effective July 1, 2018, under Tennessee Code Annotated section 36-1-102(1)(I), "it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful." 2018 Tenn. Pub. Acts, c. 875, § 2. Under the amended statute, the parent will have the burden of proving the affirmative defense by a preponderance of the evidence. *Id.* "'[B]ecause this change is substantive rather than procedural or remedial . . . , the amended statute will not be applied retroactively to this case.'" **In re Leroy H.**, No. M2017-02273-COA-R3-PT, 2018 WL 3700917, at *7 n.6 (Tenn. Ct. App. Aug. 3, 2018) (quoting **In re Gabriel B.**, No. W2017-02514-COA-

### a.    Abandonment by Failure to Visit

The petition to terminate parental rights was filed on March 3, 2017. Accordingly, the pivotal four-month period for purposes of abandonment spans from November 3, 2016, to March 2, 2017.  *See **In re Jacob C.H.***, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (explaining the calculation of the four-month period).  To briefly recap, Mother placed Jaxx in Father's custody in late October 2015.  Her visits at the park were terminated after two to three months, and the last visit she attended with Jaxx (though uninvited) was around Easter 2016.  Mother did not pursue supervised visitation with Jaxx once she was told that she would have to pay for it.  During the relevant four-month period, Mother had no visits with Jaxx.  She randomly saw him once in November 2016 at his school and once in December 2016 at Wal-mart.

The trial court's order states that Mother "abandoned the minor child and has willfully failed to visit [] the minor child for the four (4) consecutive months preceding the filing of the Petition for Termination of Parental Rights." Specifically, the trial court found that Mother had not regularly visited with the child since November 2015 and that her last visit was when she appeared uninvited around Easter. The court found that Mother failed to maintain any contact with Jaxx. It found that she knew Father's telephone number and had the ability to reach out to him to request visitation or contact with Jaxx in the four months preceding the filing of the petition but failed to do so. The court found that Mother contacted Father in 2016 but merely asked him not to marry Stepmother. It noted that Mother filed a petition to modify visitation but failed to appear at the hearing, so it was dismissed. The evidence supports these factual findings, and we conclude that this ground for termination was sufficiently proven by clear and convincing evidence.

Only one ground for termination must be proven in order to support termination of parental rights.  However, we must review the trial court's rulings with respect to all alternative grounds pursuant to the Tennessee Supreme Court's direction in *In re Carrington H.*, 483 S.W.3d at 525.

### b.    Abandonment by Failure to Support

Again, the relevant four-month timeframe for our analysis spans from November 3, 2016, to March 2, 2017.  The juvenile court had ordered Mother to pay $100 per month in child support, and she had been held in contempt for nonpayment of her obligations owed from December 2015 to July 31, 2016. However, the evidence presented at trial regarding Mother's payments and financial situation during the pivotal four-month period is very limited.

R3-PT, 2018 WL 3532078, at *4 n.7 (Tenn. Ct. App. July 23, 2018)).

Mother testified that she started working at a fast food restaurant in September 2016 and worked there until December 2016, when her abusive and controlling boyfriend made her quit. The record does not reveal how much Mother earned, but she testified that the State took roughly $35 per week out of her paycheck for child support while she was employed. Mother became pregnant in early 2017 and began cleaning houses. At the trial on March 5, 2018, Father vaguely testified that he had received "maybe, three or four minor payments within the past two years." When asked specifically if he received support from Mother from "2016 . . . up through March the 3rd of 2017," when the petition was filed, he said "rarely any support." When asked to elaborate, Father said, "I didn't receive really much of anything. I think I received one $150 payment." He believed that particular sum was paid because Mother "got arrested and then bailed out of jail for contempt, nonsupport." Father testified that he did not receive any child support from Mother during the time that she was cleaning houses, and he did not *recall* receiving any payments while she worked at the fast food restaurant either. Mother would have owed $400 for the four-month period. The record does not reveal where Mother was living during this time, what her actual income was, how often she worked, or what expenses she might have had. She had been evicted from public housing just a few months prior to the four-month period at issue due to nonpayment of rent, and a judgment was entered against her for $708.

The trial court found that Mother willfully failed to support Jaxx during the relevant four-month period and failed to maintain employment. The trial court found that Father received one support payment while Mother worked at the fast food restaurant, and the court credited Father's testimony that he did not receive any cash from Mother while she was cleaning houses. Without specifying any dates, the court also found that Mother "paid support through her purge payment" on three or four occasions. Ultimately, the court concluded that Mother failed to provide child support as ordered "despite having the means and ability to do so." At the same time, however, the court found that Mother's boyfriend refused to allow her to work and that she was dependent on him for transportation. The court found that Mother did not have a driver's license or reliable transportation.

"If failure to support [ ] is due to circumstances outside of a parent's control, then he or she cannot be said to have willfully abandoned the child." ***In re Malaki E.,*** No. M2014-01182-COA-R3-PT, 2015 WL 1384652, at *7 (Tenn. Ct. App. Mar. 23, 2015). Among other things, we must consider a parent's "financial ability, or capacity," to pay support when determining the issue of willfulness. ***In re Envy J.***, No. W2015-01197-COA-R3-PT, 2016 WL 5266668, at *14 (Tenn. Ct. App. Sept. 22, 2016) *perm. app. denied* (Tenn. Dec. 16, 2016). The relevant statutes require a willful failure to support or "to make reasonable payments" toward support, meaning, a willful failure to provide "more than token payments" toward support. Tenn. Code Ann. § 36-1-102(1)(D). Token support is defined as support that "under the circumstances of the individual case, is

- 10 -

insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). We cannot find that support is "insignificant" in light of the parent's "means" without evidence regarding the parent's actual financial support and "means." *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *11 (Tenn. Ct. App. June 3, 2003); *see also In re Malaki E.*, 2015 WL 1384652, at *7 ("The court must review a parent's means[.]"). In this context, "the word 'means' connotes both income and available resources for the payment of debt." *In re Adoption of Angela E.*, 402 S.W.3d 636, 641 (Tenn. 2013). Under the statutes in effect at the time of the proceedings below, then, the burden was on the petitioner "to illicit lucid and intelligible evidence regarding [the parent's] ability to pay support and whether her failure to do so was justified." *In re Destiny H.*, No. W2015-00649-COA-R3-PT, 2016 WL 722143, at *10 (Tenn. Ct. App. Feb. 24, 2016).

Because the sparse record does not contain any evidence about Mother's income, expenses, or living situation during the four-month period, and the trial court credited Mother's testimony that she was dependent on an abusive boyfriend for transportation and that he refused to allow her to work, we find the evidence less than clear and convincing as to the issue of willful failure to pay child support during the four months preceding the filing of the petition. We reverse the trial court's finding as to this ground.

### 2. Tennessee Code Annotated section 36-1-113(g)(14)

Aside from the ground of abandonment, the trial court also found that a ground for termination of parental rights existed pursuant to Tennessee Code Annotated section 36-1-113(g)(14), which applies when a parent:

> has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

This ground for termination was added to the controlling statute effective July 1, 2016. *See* 2016 Tenn. Pub. Acts, c. 919, § 20. "Because of the relatively recent enactment of section 36-1-113(g)(14), few cases have considered this particular ground for termination" of parental rights. *In re Isaiah B.*, No. E2017-01699-COA-R3-PT, 2018 WL 2113978, at *17 (Tenn. Ct. App. May 8, 2018).

Subsection (g)(14) requires the petitioner to prove two elements by clear and convincing evidence. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018). First, the petitioner must prove that the parent "has failed to manifest . . . an ability and willingness to personally assume legal and physical custody or financial responsibility of the child." Tenn. Code Ann. § 36-1-113(g)(14). Second, the petitioner must prove that placing the child in the parent's custody "would

pose a risk of substantial harm to the physical or psychological welfare of the child." *Id.*

We begin with the question of whether Petitioners met their burden to prove the first element of this ground for termination. As an initial matter, we note that there has been some disagreement in this Court as to the proof required of this ground. *Compare **In re Ayden S.***, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018) (holding that the petitioner must prove both an inability and unwillingness to assume custody or financial responsibility of a child), with **In re Amynn K.**, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *12 (Tenn. Ct. App. June 20, 2018) (holding that the petitioner need only prove that "a parent has failed to meet the requirement of manifesting both a willingness and an ability to assume legal and physical custody of the child or has failed to meet the requirement of manifesting both a willingness and an ability to assume financial responsibility of the child."). More recently, courts have avoided this dispute by noting that the evidence was clear and convincing under even the more stringent standard. *See, e.g., **In re J'Khari F.**, No. M2018-00708-COA-R3-PT, 2019 WL 411538, at *15 (Tenn. Ct. App. Jan. 31, 2019) (noting both **In re Ayden S.** and **In re Amynn K.** but ultimately concluding that DCS presented sufficient evidence that "Mother was not able or willing to assume physical or legal custody of or financial responsibility for the Child"); **In re Colton B.**, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at *9-10 (Tenn. Ct. App. Oct. 29, 2018) *perm. app. denied* (Tenn. Jan. 22, 2019) (noting the split in authority but holding that it was unnecessary to choose one approach where the parent had manifested neither an ability nor a willingness to parent the child).

The same is true in this case. As in **In re Colton B.**, "this is not a case where a parent manifested a willingness to assume custody and financial responsibility but was simply unable to do so." *Id.* at *10. When considering the parent's *ability*, we focus on "the parent's lifestyle and circumstances." **In re Cynthia P.**, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019). With respect to *willingness*, "we look for more than mere words" and may consider whether a parent has attempted "to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child." *Id.* A lack of effort can undercut a claim of willingness. *See id.*; *see also **In re J'Khari F.**, 2019 WL 411538, at *15 ("[A] parent's actions can demonstrate a lack of willingness to assume custody of or financial responsibility for the Child.").

Mother's actions have not manifested an ability or a willingness to assume custody of Jaxx or provide for him financially. She voluntarily gave custody to Father in October 2015 when Jaxx was two years old, stating in the written custody agreement that she was "willingly giving all parental rights" to Father until further notice. The written agreement provided that Mother intended to "sort out personal issues and to rehabilitate herself," but unfortunately Mother was unsuccessful. She attended some visits with Jaxx, but she repeatedly upset the child during visits, and her own behavior at the park led to police

involvement and the termination of those visits. In the months that followed, Jaxx was adjudicated dependent and neglected. Meanwhile, Mother was convicted of shoplifting for "switching tags" on clothes, cited for driving on a suspended license, and charged with theft for stealing food. She was placed on probation but violated its terms by failing to report to her officer and failing a drug screen. Mother was required to complete a drug and alcohol class but failed to do so. She had no reliable transportation. Mother testified that she was diagnosed with depression and post-traumatic stress disorder due to the situation involving Jaxx but that she did not want medication and was not attending counseling. She failed to maintain stable employment or pay child support consistently, such that she was found in civil contempt for willful failure to pay child support. She was evicted from public housing and lived with her brother and her younger son in a two-bedroom apartment at the time of trial, having recently ended her relationship with the abusive boyfriend.

When the termination petition was filed, Mother had not visited with Jaxx in nearly a year. She did file a petition seeking visitation at some point, but it was dismissed when she failed to appear at the hearing. Even at the termination trial, Mother conceded that she was not presently in a position to assume custody. She said, "I'm just trying to fight for my rights right now on visitation with him to have a relationship." Mother explained, "I want a relationship with him. I'm not asking for custody. I'm just asking that my rights not be terminated until he's 18 years old, and that I could . . . start up visitation with him again with me and my family." The trial court found that Mother "does not desire to have custody returned to her but desires to have the ability to visit with the child until he turns eighteen (18)." Overall, Mother's actions and omissions indicate that she is not willing *or* able to personally assume custody or financial responsibility for the child. As such, the first element of this ground for termination has been met.

The second issue is whether placing the child in the parent's custody "would pose a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14). Regarding "substantial harm" for purposes of this ground, this Court has applied the following analysis:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Virgil W.,* No. E2018-00091-COA-R3-PT, 2018 WL 4931470, at \*8 (Tenn. Ct.

App. Oct. 11, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).

By the time of trial, Jaxx, who was almost five, had been residing exclusively with Father and Stepmother for nearly two and a half years. He now has a younger sister who lives with him as well. He refers to Stepmother as "Mommy" and has been doing so since age two. He had not seen Mother at a visit in about two years. Mother had not called Jaxx on the telephone or sent him a card. She had not maintained any relationship with Jaxx at all. Mother had consistently demonstrated instability since she voluntarily ceded custody to Father in October 2015, and even by the time of trial in 2018, she was admittedly not a position to assume custody of Jaxx. She continued to struggle with mental health issues, criminal charges, and lack of transportation, and she had only recently secured employment. Given Mother's instability and the fact that she has no relationship with Jaxx, we conclude that placing Jaxx in Mother's custody "would pose a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14). This ground for termination was sufficiently proven.

### D.    Best Interest

Having determined that at least one ground for termination is supported by clear and convincing evidence, we proceed to consider whether clear and convincing evidence supports the trial court's determination that termination of Mother's parental rights is in the child's best interests. "Upon establishment of a ground for termination, the interests of the child and parent diverge, and the court's focus shifts to consider the child's best interest." *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). Even where a parent is unfit, termination may not necessarily be in the best interests of the child. *Id.*

Tennessee's termination statute lists the following factors to be used in the best interest analysis:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

The Tennessee Supreme Court has explained that:

Facts considered in the best interests analysis must be proven by a preponderance of the evidence, not by clear and convincing evidence. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interests. When considering these statutory factors, courts must remember that the child's best interests are viewed from the child's, rather than the parent's, perspective. Indeed, a focus on the perspective of the child is the common theme evident in all of the statutory factors. When the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child.

*In re Gabriella D.*, 531 S.W.3d 662, 681−82 (Tenn. 2017) (internal citations omitted). Furthermore, "[a]scertaining a child's best interests does not call for a rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. The analysis requires "more

than tallying the number of statutory factors weighing in favor of or against termination." *In re Gabriella D.*, 531 S.W.3d at 682 (citing *White v. Moody*, 171 S.W.3d 187, 193–94 (Tenn. Ct. App. 2004)). "The facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case," and the analysis "must remain a factually intensive undertaking." *In re Gabriella D.*, 531 S.W.3d at 682. Thus, "[d]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing *In re Audrey S.*, 182 S.W.3d at 878). In undertaking this analysis, the court must examine all of the statutory factors, as well as other relevant proof put forth by the parties. *Id.*

By all accounts, Jaxx is doing very well in the care of Father and Stepmother. Father testified that Jaxx "was way behind" when he initially obtained custody and only knew a few words, but he and Stepmother worked with him and enrolled him in preschool, and now he is doing great academically. Jaxx is also involved in baseball and activities at his church. In its oral ruling, the trial judge took particular note of the fact that Mother "wants some contact" with Jaxx until the age of 18, but she "doesn't actually want custody." The trial judge noted that visitation had not gone well in the past and stated that to continue that situation for years into the future would not be a good result for Jaxx. We agree with this conclusion. *See* Tenn. Code Ann. § 36-1-113(i)(5).

Looking to the statutory factors, we conclude that Mother has not adjusted her circumstances so as to make it safe and in the best interest of the child to be in Mother's home. *See* Tenn. Code Ann. § 36-1-113(i)(1). Even after she placed Jaxx in the care of Father with the stated intention of rehabilitating herself, she incurred additional criminal charges and failed to comply with the terms of her probation. Mother failed a drug screen and failed to complete a required drug and alcohol class. *See* Tenn. Code Ann. § 36-1-113(i)(7). She testified that she was diagnosed with depression and post-traumatic stress disorder but that she had not received counseling and was not taking medication. *See* Tenn. Code Ann. § 36-1-113(i)(8). She did not provide child support consistent with the child support guidelines. *See* Tenn. Code Ann. § 36-1-113(i)(9). She has not maintained visitation or other contact with Jaxx, and a meaningful relationship no longer exists between them. *See* Tenn. Code Ann. § 36-1-113(i)(3) & (4). At this point, changing his caretaker and physical environment would likely have a detrimental effect on his emotional and psychological condition. *See* Tenn. Code Ann. § 36-1-113(i)(5). Considering the statutory factors, we find clear and convincing evidence to support the trial court's conclusion that termination of Mother's parental rights is in the best interest of the child.

## V. CONCLUSION

For the aforementioned reasons, we affirm the decision of the chancery court in part, reverse in part, and remand for further proceedings. Costs of this appeal are taxed to

the appellant, Brianna B., for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE